THE PENN MUTUAL LIFE INSURANCE COMPANY, PETITIONER, *v.*
COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 59670.   Promulgated June 28, 1935.

*Robert Dechert, Esq.*, for the petitioner.
*John D. Foley, Esq.*, and *James Maddox, Esq.*, for the respondent.

OPINION.

McMAHON: This is a proceeding for the redetermination of a deficiency in income tax for the year 1929 in the amount of $75,-641.69.  The statement, order, numbering, and grouping of the issues is ours.

PART I

Petitioner alleges that the respondent erred in failing to allow as a deduction:

(1) Interest in the amount of $190,180.40 paid in the year 1929 on proceeds of ordinary life policies which matured by death and which petitioner continued to hold.

Respondent alleges in part as follows:

III. * * * that in the event that petitioner's claim set forth in subparagraph (f) of paragraph 4 and subparagraph (f) of paragraph 5 [our assignment of error (1)] is allowed, then the deduction of $212,132.81, representing 4% of the mean of petitioner's liability on matured policies, the proceeds of which are held by it at interest was improperly allowed as a deduction from gross income for the calendar year 1929.

*Findings of Fact.*—The petitioner is a corporation, organized under the laws of Pennsylvania, and is engaged in the business of a life insurance company, having its principal office at Philadelphia. it is a purely mutual company, having no stockholders. It operates on the participating plan of insurance.

Petitioner issued a type of policy denominated " Ordinary Life Policy—Annual Dividends ", a specimen of which (Exhibit 1) is incorporated herein by reference.

When policies of this type mature there are occasions when the petitioner retains the proceeds under an arrangement with the beneficiary or with the insured pursuant to Option D of the policy. In the year 1929 the petitioner held the proceeds of a number of policies under arrangements with either beneficiaries or those insured. There is considerable variation in the terms under which these sums are left with the petitioner, varying from those in which the beneficiary has the right at any time to make full withdrawal to those under which the beneficiary has no right of withdrawal and the final payment depends upon the happening of some contingency, such as the death of the beneficiary. So far as the petitioner is concerned, the election may be to leave it on demand. The petitioner is not in a position to refuse any reasonable terms demanded by the policyholder or by the beneficiary. The petitioner has not the right to demand that the beneficiary take over the proceeds at any time. It must hold the proceeds until an event occurs which requires that payment be made, or until the beneficiary demands payment. A large portion is left subject to demand withdrawals by beneficiaries.

The total rate at which income or earnings was paid to the beneficiaries who were receiving income under this arrangement in 1929 was 4.85 percent, made up of 3 percent as guaranteed by the contract and an additional 1.85 percent awarded by the board of trustees for that year. During 1929 a guaranteed amount of 3 percent was paid on all proceeds of all types of policies left with the petitioner and an additional 1.85 percent was in all such cases awarded by the trustees. The rate of 4.85 percent paid under ordinary life policies has been constant for approximately the last eight years. The fact that this total rate is being paid under such arrangements is made known to the public by the petitioner through its agents and policyholders, its printed canvassing material and advertising, but petitioner does not thereby directly promise to pay it, and is not bound to pay it. No one

has the authority to bind the petitioner in that respect except the board of trustees. If the board of trustees should consider that they would not pay anything in addition to the 3 percent, it would not have to be paid.

The amount thus paid by petitioner in 1929 on proceeds of policies left in the manner above described with the petitioner after the maturity of the policies by the death of the insured, or otherwise, was $190,180.40. The petitioner deducted this amount as "interest" paid in its income tax return for the year 1929. The deduction was disallowed by the respondent.

During 1929 the petitioner maintained a reserve to cover the proceeds left with the company as above described. At the beginning of the year such reserve was in the amount of $4,404,995.95 and at the end of the year the reserve amounted to $6,201,644.33. This reserve was included in the calculation of reserve funds required by law and 4 percent of the mean thereof was taken as a deduction on the petitioner's return for the year 1929 and was allowed by the respondent.

*Opinion.*—The petitioner contends that the amount of $190,180.40 paid in the year 1929 to beneficiaries as income upon proceeds of matured ordinary life policies constituted deductible interest within the meaning of section 203 (a) (8) of the Revenue Act of 1928.[1] A similar issue was presented in *Penn Mutual Life Insurance Co.*, 32 B. T. A. 839, wherein, upon similar determinative facts, we held that the 3 percent paid under similar arrangements constitutes deductible interest, but that the additional 1.85 percent is not deductible as interest, under the Revenue Acts of 1926 and 1928, which are similar. Upon the whole record and the authority of our holding in that proceeding, we hold that the amount calculated at 3 percent in question under this issue in the instant proceeding is deductible as interest, but that none of the amount calculated at 1.85 percent is deductible. Accordingly, upon the redetermination, 3/4.85 of $190,-180.40 will be allowed as a deduction and the remainder thereof will be disallowed.

In view of our holding that a portion of the amount of $190,180.40 is deductible as interest, it becomes necessary to consider the respondent's affirmative allegation III. It is the contention of the respondent that he committed error in allowing as a deduction in the year 1929 the amount of $212,132.81, being 4 percent of the mean of the reserve to cover proceeds of these matured policies. The

---

[1] (a) *General rule.*—In the case of a life insurance company the term "net income" means the gross income less—

\*          \*          \*          \*          \*          \*          \*

(8) INTEREST.—All interest paid or accrued within the taxable year on its indebtedness  \*  \*  \*.

applicable provisions of the Revenue Act of 1928 are contained in section 203 (a) (2).[2]

The case of *Helvering* v. *Inter-Mountain Life Insurance Co.*, 294 U. S. 686, while not directly in point, is, in our opinion, governing herein in principle. The question there presented was whether assets held by the company against matured and unpaid coupons attached to 20-payment life coupon nonparticipating policies constituted reserve funds required by law within the meaning of section 245 (a) (2) of the Revenue Act of 1921. Such section is similar to the section of the Revenue Act of 1928 with which we are concerned. The Supreme Court, in holding that such assets did not constitute reserve funds required by law, stated in part:

* * * We are not here dealing with reserves in relation to solvency of the company. The thing to be ascertained is the meaning that Congress intended by the language "4 per centum of the mean of the reserve funds required by law." The clause to be construed relates exclusively to life insurance companies. It is intended to define a deduction which they are permitted to make in the calculation of the net amount to be taxed. The rule that ambiguities in statutes imposing taxes are to be resolved in favor of taxpayers does not apply. Deductions are allowed only when plainly authorized. *Ilfeld Co.* v. *Hernandez*, 292 U. S. 62, 66. *New Colonial Co.* v. *Helvering*, 292 U. S. 435, 440.

The word "reserve" has many meanings. Accounts creating reserves are set up in almost every line of business and funds evidenced by the book entries are held for many and widely different purposes. As the Act does not permit corporations other than insurance companies to make deductions of the kind here under consideration, "*reserve funds*" *may not reasonably be deemed to include values that do not directly pertain to insurance. In life insurance the reserve means the amount, accumulated by the company out of premium payments, which is attributable to and represents the value of the life insurance elements of the policy contracts.* The premiums include enough, over and above what is needed to maintain proper insurance reserves, to provide for the discharge of coupon liability according to the terms of the policy. The coupon values are the equivalent of cash and may be used to pay premiums on the face amount of the policy, to procure additional insurance, to lessen the number of annual premiums or otherwise to obtain insurance protection. The amounts so applied cease to exist as coupon liabilities and automatically become a part of the life insurance reserves. These differ essentially from coupon liability. *Life insurance matures only upon the death of the insured and the life reserve is based upon that contingency, whereas liability on the matured coupons depends upon no contingency.* It follows that the insurance reserves alone constitute the base on which the deduction is to be computed. Reserves against matured coupons are excluded. *McCoach* v. *Insurance Co. of N. Amer.*, 244 U. S. 585, 589. *United States* v. *Boston Insurance Co.*, 269 U. S. 197, 202. *New York Ins. Co.* v. *Edwards*, 271 U. S. 109, 119. *Duffy* v. *Mutual Benefit Co.*, 272 U. S. 613, 618–619. *Continental Assur. Co.* v. *United States*, 8 F. Supp. 474. [Emphasis supplied.]

---

[2] (a) *General rule.*—In the case of a life insurance company the term "net income" means the gross income less—

* * * * * * *

(2) RESERVE FUNDS.—An amount equal to the excess, if any, over the deduction specified in paragraph (1) of this subsection, of 4 per centum of the mean of the reserve funds required by law and held at the beginning and end of the taxable year * * *.

See also *North American Reassurance Co.*, 29 B. T. A. 683; *Midland Mutual Life Insurance Co.*, 19 B. T. A. 765; and *Continental Assurance Co.* v. *United States*, 8 Fed. Supp. 474.

It will be seen that the Supreme Court interprets " reserve funds required by law " [3] as meaning only the reserve funds held by a life insurance company against the *contingency of death* of the insured. In the instant proceeding the reserve in question represents proceeds of *matured* ordinary life insurance policies which were held under an agreement. These funds were not held subject to the contingency of death of the insured, since the insured had already died. Immediately after that event the petitioner had the money representing the face of the policy in each instance, which was subject to the demand of the beneficiary. Any reserve thereafter carried to meet such demand in reality constituted a reserve to meet the contractual liability of the petitioner to the beneficiary, with whom it stood in the relationship of debtor and creditor. We accordingly hold that the reserve in question did not constitute " reserve funds required by law " within the meaning of section 203 (a) (2) of the Revenue Act of 1928; and upon the recomputation the deduction which was allowed by the respondent will be disallowed.

## PART II.

Petitioner alleges that respondent erred in failing to allow as deductions:

(2) Interest in the amount of $5,712.52 paid to policyholders, in 1929, on deferred dividends, pursuant to ordinary life accumulated surplus policies;

(3) Interest (3 percent) guaranteed and actually paid by petitioner in 1929 in the amount of $250,443 as a part of guaranteed installments under matured policies, the proceeds of which were payable in installments;

(4) Interest in the amount of $198,487.08, being the interest (1.85 percent) in excess of the guaranteed interest (3 percent) referred to in (3), actually paid by the petitioner in 1929 on policies which had matured by death, the proceeds of which were paid in installments.

Respondent alleges in part as follows:

I. * * * that in the event that the claim of petitioner set forth in subparagraph (d) of paragraph (4) and subparagraph (d) of paragraph 5 [our assignment of error (2)] is allowed, then such deduction of $383.90, being 2% of the deferred dividend reserve as at December 31, 1929, was improperly allowed as a deduction from gross income for the calendar year 1929.

---

[3] The law of Pennsylvania, the state in which the petitioner was incorporated, with regard to reserve liabilities is contained in sections 71 and 72 of Title 40 of Purdon's Pennsylvania Statutes Annotated, Permanent Edition.

II. * * * that in the event that the petitioner's claims set forth in subparagraphs (e) and (h) of paragraph 4 and subparagraphs (e) and (h) of paragraph 5 [our assignments of error (4) and (3), respectively] are allowed, then such deduction of $335,027.86, being 4% of the mean of petitioner's liability on matured policies, the proceeds of which are payable in a fixed number of installments, was improperly allowed as a deduction from gross income for the calendar year 1929.

*Findings of Fact.*—The petitioner issued, prior to 1909, a type of policy denominated " Ordinary Life Accumulated Surplus Policy ", a specimen of which (Exhibit 3) is incorporated herein by reference.

The particular respect in which this policy differs from other policies is that it is on the accumulated surplus plan. The payment of surplus was postponed for a period varying from 10 to 20 years from the date of issue, the payment to be then made to those who survived and whose policies remained in force. The " dividends " under policies of this type were declared and set apart on the books of the petitioner year by year, even though not actually paid out. Petitioner maintained an individual card record for each policyholder and on each was set up the annual " dividend " payment. This was carried forward at so-called " interest " and upon lapse of the policy or death during the period the amount accrued up to that time was transferred to a general fund and was carried forward at so-called " interest " for distribution among the survivors. The placing of an amount on the card of any accumulated surplus policyholder did not create any direct immediate liability to that individual. The amount of so-called " interest " on the retained " dividends " was set up on the books of the petitioner each year. The so-called " interest " on these " dividends " which were retained during the accumulated surplus period was compounded annually. The rate of so-called " interest " varied from time to time in accordance with the action of the board of trustees, but was never less than 4 percent. The fact that the petitioner not only retained the " dividends ", but also so-called " interest " added to them on the compound basis, was made known to policyholders and prospective policyholders on forms which the agents distributed. The term " dividends ", which is used colloquially in the insurance field, is not accurate, since the amounts referred to are refunds of portions of premiums or returns of overcharges.

The petitioner always knew the names of the entire group from which the ultimate recipients of the accumulated surplus fund would come. There never was any case where the original group in this type of insurance all died. If none had survived there could not thereafter have been any payees in that group.

By the end of 1929 there were very few of this type of policy remaining on the books of the petitioner. The period chosen was usually 20 years or less. The great bulk of them had been paid off

by 1929. However, in 1929 there were accumulations of " dividends " plus so-called " compound interest " on this type of policy which were actually paid out to policyholders.

The amount of so-called " interest " paid in 1929 to holders of the accumulated surplus type of policy, in addition to the aggregate of " dividends " that had been retained throughout the accumulated surplus period ending in 1929, was $5,712.52. This figure represents the so-called " compound interest " paid out under this type of policy during 1929, reduced by the statutory 2 percent of deferred dividends claimed and allowed. The petitioner claimed this amount of $5,712.52 as a deduction on its income tax return for the year 1929. The deduction was disallowed by the respondent.

The reserve for the accumulated surplus policies at the end of the year 1929 was $19,194.79. The petitioner claimed a deduction in its return for the year 1929 of 2 percent of that figure, or $383.90. The deduction was allowed by the respondent.

The petitioner issued a type of policy denominated " Ordinary Life Trust Certificate or Instalment Policy—Annual Dividends ", a specimen of which (Exhibit 2) is incorporated herein by reference.

Under this type of policy it is the commuted value which is set up by petitioner as a reserve. In so far as actuarial calculation is concerned, each installment payment consists of a part of the commuted value at the date of death of the insured, plus a guaranteed rate of 3 percent.

While this policy (section 7) purports to apply only in case of the death of the beneficiary, it has been the practice of the petitioner to interpret it as permitting the beneficiary to take installments in accordance with the provisions of the policy for a time and to then draw down the remaining principal on the commuted basis. As to the bulk of the petitioner's business on this plan the beneficiary has either a limited or complete right of withdrawal, at any time, of the remaining installments-certain, that is, their then worth or commuted value. The insured during his lifetime has the privilege of taking away from the beneficiary the right to draw down the commuted value at any time, but the practice of the petitioner has been not to refuse to pay the commuted value unless the insured has so directed.

The ordinary life policy (section 7) contains an option (Option A) for payment of installments-certain over a fixed period of years if the insured before his death, or the beneficiary afterwards, so elects. If such election is made the ordinary life policy becomes, in general, similar to the ordinary life trust certificate or installment policy so far as payment is concerned. In the instances where such election was made the proceeds of the ordinary life policies as converted were no longer included by the petitioner in the group

of policies the proceeds of which were held at so-called "interest", but were treated in the same manner as ordinary life trust certificates or installment policies.

During the year 1929 the petitioner paid $250,443 as guaranteed so-called "interest" included in the face of the installments paid under both the life trust certificates or installment policies and the ordinary life policies converted to that form by the election of the option (Option A).

In addition to the guaranteed so-called "interest" paid by the petitioner as part of the face of the installments under both these types of policies, the petitioner paid out with each installment additions awarded by the board of trustees as provided for in both types of policy (section 7). For the year 1929 these additional payments as to each type of policy consisted of 1.85 percent of the remaining commuted value in the hands of the petitioner. The payment of this 1.85 percent, in addition to the 3 percent guaranteed so-called "interest" on these types of policies, has been constant for about the last eight years. This fact is made known by the petitioner to the public generally, through announcements to agents, policyholders and prospective policyholders and by inclusion in advertising, but petitioner does not thereby directly promise to pay it, and is not bound to pay it. No one has the authority to bind the petitioner in that respect except the board of trustees. If the board of trustees should determine that they would not pay anything in addition to the 3 percent, it would not have to be paid.

In 1929 the petitioner paid so-called "interest" to beneficiaries on matured installment policies, both of the trust certificate type which were originally payable in installments, and of the ordinary life type which were converted into installment policies by action of the insured or beneficiary, in the amount of $198,487.08, over and above the guaranteed 3 percent. This figure represents the additional 1.85 percent. The petitioner in its return for the year 1929 claimed this amount as a deduction and it was disallowed by the respondent.

The reserve maintained during the year 1929 to cover installment policies of the two types described amounted to $8,181,749 at the beginning of the year and $8,569,644 at the end of the year. This reserve was included in the calculation of the reserve funds required by law. Four percent of the mean of this reserve was claimed as a deduction on the petitioner's return for the year 1929 and was allowed by the respondent.

*Opinion.*—Issues similar to these three issues were presented in *Penn Mutual Life Insurance Co.*, *supra*, wherein, upon similar determinative facts, we held that similar payments are not deductible as interest under the Revenue Acts of 1926 and 1928, which are similar.

Upon the whole record and the authority of our holding in that proceeding, we hold that none of the amounts in question under these issues in the instant proceeding are deductible.

In view of our holding upon these three assignments of error of petitioner, it is unnecessary to further consider or pass upon respondent's affirmative allegations I and II, which are in the alternative.

## PART III.

Petitioner alleges that respondent erred in failing to allow as deductions:

(5) Real estate taxes in the amount of $65,384.13 paid in the year 1929 on the petitioner's home office building;

(6) Expenses in the amount of $133,286.99 paid during the year 1929 for maintaining the petitioner's home office building;

(7) Depreciation in the amount of $51,317 for the year 1929 on the petitioner's home office building.

*Findings of Fact.*—During the year 1929 the petitioner occupied its own 10-story granite building located on the southeast corner of Sixth and Walnut Streets, Philadelphia. It was built in 1915. No tenants other than the petitioner occupied this building during the year 1929. The book value of this building as of December 31, 1929, was $1,950,000. The petitioner included no rental value of this building in gross income in its return for the year 1929.

During 1929 the petitioner paid taxes on this building in the amount of $65,284.13, and paid $133,286.99 as expenses for maintaining this home office building. These amounts were claimed as deductions in the petitioner's return for the year 1929, but were disallowed by the respondent. In its return for 1929 the petitioner also claimed as a deduction as depreciation on its home office building the amount of $51,317. That figure was used as the amount of depreciation by authority of the board of trustees. The respondent disallowed this claimed deduction.

The petitioner had also acquired four buildings adjoining its office building prior to 1929. During 1929 it occupied portions of these buildings while portions were occupied by tenants with hold-over leases. During 1929 petitioner received rental from these buildings in the amount of $18,276.42, which was included as income in its return for that year. The petitioner's return for 1929 included income from rental in the total amount of $117,730.63. All of this figure over $18,276.42 represents rental from other property acquired under foreclosure proceedings.

*Opinion.*—Petitioner contends that the respondent erred in disallowing as deductions taxes paid upon its home office building, expenses of maintaining the building and depreciation thereon in the

respective amounts of $65,284.13, $133,286.99, and $51,317. There is no controversy as to the figures. The controversy arises due to the fact that the petitioner included no rental value for its building in its gross income for the year 1929. The applicable provisions of the statute are contained in section 203 (a) (6) and (7) and (b) of the 1928 Act.[4]

It is also alleged and contended by petitioner that section 203 (b) is unconstitutional in requiring a rental value of real estate occupied by the petitioner to be included in gross income in order that deductions may be made for taxes, expenses, and depreciation.

The Supreme Court of the United States recently held, in *Helvering* v. *Independent Life Insurance Co.*, 292 U. S. 371, and *Rockford Life Insurance Co.* v. *Commissioner*, 292 U. S. 382, that such section (203 (a) (6) (7) and (b), *supra*,) and corresponding similar provisions of the Revenue Acts of 1921 and 1924 are constitutional. Upon authority of those cases we so held in *Penn Mutual Life Insurance Co.*, *supra*. Accordingly, petitioner is not entitled to these claimed deductions unless it is willing to have included in its gross income, in accordance with the provisions of the statute, the rental value of the real estate which it owned and occupied in whole or in part. *Peoples Life Insurance Co.*, 31 B. T. A. 706. It may be well to point out, as was done in *Commonwealth Life Insurance Co.*, 31 B. T. A. 887, that this statute is so worded that an insurance company which occupies all of the space in a building and consequently receives no rents for space occupied by others, will not derive any benefit under the provisions of section 203 (a) (6) and (7) when read in connection with subdivision (b).

The petitioner will be entitled to these claimed deductions only in the event that the conditions prescribed in section 203 (b) are met;

---

[4] (a) *General rule.*—In the case of a life insurance company the term " net income " means the gross income less—

\* \* \* \* \* \* \*

(6) REAL ESTATE EXPENSES.—Taxes and other expenses paid during the taxable year exclusively upon or with respect to the real estate owned by the company, not including taxes assessed against local benefits of a kind tending to increase the value of the property assessed, and not including any amount paid out for new buildings, or for permanent improvements or betterments made to increase the value of any property. The deduction allowed by this paragraph shall be allowed in the case of taxes imposed upon a shareholder of a company upon his interest as shareholder, which are paid by the company without reimbursement from the shareholder, but in such cases no deduction shall be allowed the shareholder for the amount of such taxes;

(7) DEPRECIATION.—A reasonable allowance for the exhaustion, wear and tear of property, including a reasonable allowance for obsolescence;

\* \* \* \* \* \* \*

(b) *Rental value of real estate.*—No deduction shall be made under subsection (a) (6) and (7) on account of any real estate owned and occupied in whole or in part by a life insurance company unless there is included in the return of gross income the rental value of the space so occupied. Such rental value shall be not less than a sum which in addition to any rents received from other tenants shall provide a net income (after deducting taxes, depreciation and all other expenses) at the rate of 4 per centum per annum of the book value at the end of the taxable year of the real estate so owned or occupied.

and, in that event, a computation similar in principle to the computation approved in *Peoples Life Insurance Co.*, *supra*, will be necessary.

## Part IV.

Petitioner alleges that respondent erred in failing to allow as a deduction:

(8) The sum of $71,347.69 or any other sum on account of depreciation upon furniture and fixtures.

*Findings of Fact.*—The petitioner took no deduction in its return for the year 1929 on account of depreciation on furniture, fixtures, and equipment belonging to it, and the respondent did not allow any such deduction.

There was received in evidence, without objection on the part of respondent, Exhibit 4, a statement prepared from the books of the petitioner by E. Paul Huttinger, who, in 1929, was vice president of the petitioner in charge of taxation, purporting to show the purchases of furniture and fixtures in each year from 1914 to 1930 and the depreciation sustained thereon in those years. We incorporate such exhibit herein by reference but set forth only the portion applicable to the year 1929, as follows:

| | Amount bought | Depreciation sustained in 1929 | | Amount bought | Depreciation sustained in 1929 |
|---|---|---|---|---|---|
| 1919 | $27,092.23 | $1,354.64 | 1926 | $54,343.59 | $5,434.36 |
| 1920 | 37,836.08 | 3,783.61 | 1927 | 87,712.74 | 8,771.27 |
| 1921 | 31,923.19 | 3,192.32 | 1928 | 171,670.93 | 17,167.09 |
| 1922 | 41,763.54 | 4,176.35 | 1929 | 170,052.77 | 8,502.64 |
| 1923 | 57,440.76 | 5,744.08 | | | |
| 1924 | 70,190.68 | 7,019.07 | Total | | 71,347.69 |
| 1925 | 62,022.56 | 6,202.26 | | | |

The depreciation shown above as having been sustained in 1929 on equipment purchased in 1919 purports to be the remaining undepreciated cost. In all other cases the depreciation shown for 1929 on equipment purchased in any other year was calculated at 10 percent per annum, except that on that purchased in 1929, a rate of 5 percent was used, the theory being that some furniture may have been purchased at the beginning of the year and some at the end of the year.

*Opinion.*—There is no detailed proof as to the character of the equipment involved or the length of the useful life thereof, which is the basis for determining the correct rate of depreciation. The correct rate of depreciation not being shown, the Board is not in a position to determine, upon all of the essential facts by the exercise of its independent judgment, what amount, if any, of depreciation

of this character was sustained by the petitioner in the year in question. *Georgia, Florida & Alabama Railroad Co.*, 31 B. T. A. 1.

Furthermore, it has been held that a life insurance company may not deduct depreciation upon furniture and fixtures which are not used in connection with the company's investment business, the income of which is taxed, as distinguished from its underwriting business, *Rockford Life Insurance Co.* v. *Commissioner, supra; Commonwealth Life Insurance Co.*, 31 B. T. A. 887; and *Illinois Life Insurance Co.*, 30 B. T. A. 1160; and there is no evidence in the record upon which we can determine the portion of the furniture, fixtures, and equipment which was used in the investment portion of petitioner's business.

Hence no adjustment in respect to such depreciation will be made in the recomputation under Rule 50.

Reviewed by the Board.

*Decision will be entered under Rule 50.*

Matthews dissents.