GREAT SOUTHERN LIFE INSURANCE COMPANY, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 56540, 64064, 71144. Promulgated November 22, 1935.

514

*Thomas Watters, Jr., Esq.,* for the petitioner.
*John D. Kiley, Esq.,* for the respondent.

OPINION.

BLACK: These proceedings, duly consolidated, involve deficiencies in income tax for the calendar years 1928, 1929, and 1930 of $3,391.68, $3,528.33, and $4,154.73, respectively. The amounts in controversy are in excess of the deficiencies.

Petitioner, a Texas corporation, with its home office in the city of Houston, is a stock company doing business usual to that of a life insurance company, operating on the legal reserve level premium plan. It keeps its books and records and files its Federal income tax returns on the cash receipts and disbursements basis.

At the hearing the parties filed an agreed statement of facts, in which certain concessions were made by both parties, certain issues withdrawn and abandoned, and certain facts stipulated. This stipulation is a part of the record and need not be incorporated herein. As to the issues agreed upon and concessions made in the said agreed statement of facts, effect will be given thereto in a redetermination under Rule 50. We will now dispose of the contested issues.

*Issue (b).*—The failure of the Commissioner to consider as a reserve required by law, the reserve maintained by petitioner for matured and unpaid coupons, and to allow as a deduction from gross income 4 percent of the mean of the said reserve.

Since the hearings in this case and the filing of briefs by counsel for both sides, the Supreme Court of the United States has decided this issue adversely to the contention of petitioner and in favor of the determination of respondent. *Helvering* v. *Inter-Mountain Life Insurance Co.,* 294 U. S. 686. Upon authority of that decision we sustain the Commissioner as to issue (b).

*Issue (b) (1).*—Petitioner makes an alternative issue in which it contends that, if the reserve specified in issue (b) is held not to be a reserve within the meaning of section 203 (a) (2) of the Revenue Act of 1928, petitioner is entitled to a deduction from gross income of the amount disbursed by it as interest, such interest being on coupons heretofore left to accumulate at interest and surrendered during the

taxable year. This issue is applicable only to the year 1930 and is raised by an amendment to the petition in Docket No. 71144.

The facts with reference to this assignment of error were stipulated as follows:

At line 10 of page 3 of petitioner's Annual Statement for the taxable year 1930, it reported a disbursement of $108,924.25, representing coupons and accumulated interest thereon surrendered during the taxable year.

The said item included interest disbursed in the amount of $23,793.60, such amount of interest being due to holders of coupon policies (of the type filed as " Exhibit 5 " herein), and representing interest accumulated on the coupons thereto attached, and which had theretofore been left with the company to accumulate at interest but were surrendered during the taxable year 1930.

The said amount of interest disbursed, to-wit, $23,793.60, as above stated, was disbursed to the said policyholders in cash, or in lieu of cash, was applied to shorten the premium paying period, or to purchase additional insurance, or to pay renewal premiums.

The provisions of the policy contract with reference to the coupons in question were as follows:

#### PARTICIPATION IN PROFITS

Dividends will be declared at the end of the first policy year and at the end of each year thereafter during the premium paying period, the minimum dividend being represented by coupons attached hereto, and upon surrender of the said coupons, as specified thereon, may be received by the Insured in accordance with anyone of the following:

#### FOUR DIVIDEND OPTIONS

I. In Cash.
II. Applied to the payment of any premium or premiums.
III. Applied to the purchase of paid-up additions to the policy.
IV. Left to accumulate to the credit of the policy, with interest at not less than three and one-half per centum per annum, payable at maturity of the policy but withdrawable at any time by the Insured.

In *Reserve Loan Life Insurance Co.*, 18 B. T. A. 359, we held that interest paid and credited to policyholders on coupons attached to " guarantee premium reduction policies " constitutes a paying off by the company of a policy obligation and therefore is not deductible as interest on indebtedness under section 245 (a) (8) of the Revenue Acts of 1921, 1924, and 1926. It will be noted that our decision on this particular point in that case was based on the fact that the coupon obligations of the policies were insurance obligations and that the Reserve Loan Life Insurance Co. was entitled to take as a deduction 4 percent of the mean of the reserves which it held at the beginning and the end of the year for the payment of these obligations. In the light of the Supreme Court's decision in *Helvering* v. *Inter-Mountain Life Insurance Co., supra,* our decision in that respect was

wrong. In *Reserve Loan Life Insurance Co., supra*, the taxpayer only asked deductions for the interest paid on coupons as an alternative in case the Board did not allow deduction of 4 percent of the mean of the reserves held for the payment of coupon obligations, and, in view of the fact that we allowed the 4 percent deduction of the mean of reserves claimed, it was really not necessary that we should pass upon the alternative contention. However, we did pass upon it and held against the insurance company's alternative contention.

In the light of the Supreme Court's decision in the *Inter-Mountain Life Insurance Co.* case that coupons of the kind we were there discussing are not insurance obligations carrying with them the contingencies ordinarily applicable to insurance obligations, but represent absolute obligations free from contingencies, in *Reserve Loan Life Insurance Co., supra*, we should have disallowed the claimed deduction of 4 percent of the mean of the reserves held to secure the payment of the coupon obligations and should have sustained the taxpayer's alternative contention with respect to interest paid.

In the instant case the policies distinctly provide that " Dividends will be declared at the end of the first policy year and at the end of each year thereafter during the premium-paying period, the minimum dividend being represented by coupons attached hereto ", etc. It would seem therefore that these coupon obligations and any interest paid thereon would clearly come within the provisions of article 975 of Regulations 74, Revenue Act of 1928, which reads in part as follows:

(3) The deduction allowed by section 203(a)(8) for interest on indebtedness is the same as that allowed other corporations by section 23(b), but this deduction includes item 18 of the disbursement page of the annual statement of life insurance companies to the extent that interest on dividends held on deposit and surrendered during the taxable year is included therein. Dividends left with the company to accumulate at interest are a debt and not a reserve liability.

The Commissioner's regulations quoted above, holding that dividends represented by coupons left to accumulate with the company at interest such as we have in the instant case are a debt and not a reserve liability, were in effect upheld by the Supreme Court in the *Inter-Mountain Life Insurance Co.* case. See also *Massachusetts Mutual Life Insurance Co.* v. *United States*, 288 U. S. 269. It would seem therefore to follow as a matter of course that the insurance company, being disallowed any deduction of 4 percent of the mean of the reserves held to secure such coupon indebtedness, would be entitled to deduct any interest paid on the dividends which had been left to thus accumulate.

We therefore think petitioner should be sustained in this alternative assignment of error to the extent of the amount paid as interest

on these surrendered coupons. Petitioner's liability for interest on these matured coupons left to accumulate with the company was not contingent. It was absolute. Each coupon attached to the policy was for a definite amount and when the coupon matured it could be used as provided in any one of the four options set out in the policy, but, if left to accumulate to the credit of the policy, the amount represented by the coupon was to draw interest at the rate of 3½ percent per annum and the policyholder was privileged to withdraw the amount represented by the matured coupons at any time and receive interest thereon at the rate of 3½ percent per annum.

We think the interest deduction which the petitioner here claims is not substantially different from that involved in assignment of error (3), *Penn Mutual Life Insurance Co.*, 32 B. T. A. 839, wherein we held that where under the terms of a life insurance policy, the beneficiary exercises an option to leave the " net proceeds with the company at interest at the rate of 3 percent per annum ", a new relationship between new parties arises—that of debtor and creditor— not involving life contingency and the guaranteed interest payments of 3 percent are allowable deductions under provisions of applicable sections of the revenue acts. To the same effect is our holding on issue 1 in *Penn Mutual Life Insurance Co.*, 32 B. T. A. 876. The Commissioner has taken this view in I. T. 2717, C. B. XII–2–94, wherein it is held: " Where coupons attached to certain life insurance policies known as ' guaranteed premium reduction policies ' are left with the company to accumulate at interest, the amount of such interest actually paid out in cash, or amounts applied to shorten the premium-paying period, or to purchase additional insurance or to pay renewal premiums, which amounts are considered as the equivalent of cash payments, are allowable as deductions in computing the net income of the life insurance company."

We therefore hold that petitioner is entitled to have allowed as a deduction from its 1930 gross income the amount of $23,973.80 which it is stipulated it disbursed in that year to holders of coupons who surrendered them in that year.

*Issue (c)*.—The failure of the Commissioner to allow as a deduction from gross income, depreciation on all furniture, fixtures and equipment owned by petitioner and used by it in the conduct of its business, regardless of whether used in the underwriting department or in the investment department.

This issue presents only a question of law, which, since the filing of briefs, has been settled by the United States Supreme Court. In *Rockford Life Insurance Co.* v. *Commissioner*, 292 U. S. 382, it was held that a life insurance company was not entitled to deduct all the depreciation on its furniture and fixtures, but only such part as might fairly be attributed to the income taxed. The parties have stipulated for each taxable year involved the amount of depreciation

which fairly may be attributed to income taxed, together with the amount heretofore allowed by respondent.

The respondent, under Rule 50, should increase his allowance for depreciation and allow, in place of the amount heretofore allowed, the amounts which have been stipulated as attributable to the income taxed.

*Issue (d).*—The failure of the Commissioner to allow as a deduction from gross income, depreciation on automobiles owned by petitioner and used by it in the conduct of its business, regardless of whether used in the underwriting department or in the investment department.

The principle involved in this issue is identically the same as was involved in issue (c). The parties have stipulated that the respondent has not allowed petitioner any deduction for depreciation of its automobiles, and that the amounts of depreciation of petitioner's automobiles which fairly may be attributed to the income taxed are $635.96 for 1928, $1,049.87 for 1929 and $1,683.75 for 1930. In the redetermination that is to follow these amounts should be allowed.

*Issue (e).*—The failure of the Commissioner to allow as a deduction from gross income, the amount of actual investment expenses disbursed, and the failure of the Commissioner to allow as an actual investment expense also deductible from gross income, certain personal property taxes paid in the State of Texas on investments, capital and surplus.

The respondent concedes that in place of investment expenses heretofore allowed petitioner of $56,650.40 for 1928, $64,716.27 for 1929, and $80,983.71 for 1930, there should be allowed petitioner as investment expenses actually paid during these years (no part of petitioner's general expenses being included therein) the amounts of $74,952.53 for 1928, $82,221.41 for 1929, and $113,322.23 for 1930.

In addition to the above amounts, petitioner also paid, during the taxable years, personal property taxes in the State of Texas in amounts as follows:

| | |
|---|---|
| 1928 | $66,565.54 |
| 1929 | 62,894.21 |
| 1930 | 94,178.47 |

The above taxes were paid pursuant to article 4754 of the Insurance Laws of the State of Texas, Digest of 1932, which reads as follows:

Insurance companies incorporated under the laws of this State shall hereafter be required to render for State, county and municipal taxation all of their real estate as other real estate is rendered. All personal property of such insurance companies shall be valued as other property is valued for assessment in this State in the following manner: From the total valuation of its assets shall be deducted the reserve being the amount of the debts of insurance companies by reason of their outstanding policies in gross, and from the remainder

shall be deducted the assessed value of all real estate owned by the company and the remainder shall be the assessed taxable value of its personal property. Home insurance companies shall not be required to pay any occupation or gross receipt tax.

The parties have stipulated that the said taxes were assessed upon the basis of capital and surplus, less real estate owned, as follows:

|  | 1928 | 1929 | 1930 |
| --- | --- | --- | --- |
| Capital | $600,000.00 | $2,400,000.00 | $2,400,000.00 |
| Surplus | 2,032,902.92 | 1,166,153.31 | 1,443,174.00 |
| Less real estate owned | 126,463.37 | 160,835.45 | 358,320.44 |

The parties have also stipulated that at all times throughout the taxable period 1928 to 1930, inclusive, petitioner owned investments in an amount equal to its reserve, capital, and surplus.

Petitioner contends that the said taxes constitute a proper deduction from gross income as "investment expenses" as that term is used in section 203 (a) (5) of the Revenue Act of 1928.

The respondent contends that petitioner is not entitled to deduct the said personal property taxes as investment expenses.

The applicable statute, Revenue Act of 1928, is as follows:

SEC. 203. NET INCOME OF LIFE INSURANCE COMPANIES.

(a) *General rule.*—In the case of a life insurance company the term "net income" means the gross income less—

\*      \*      \*      \*      \*      \*      \*

(5) INVESTMENT EXPENSES.—Investment expenses paid during the taxable year: *Provided,* That if any general expenses are in part assigned to or included in the investment expenses, the total deduction under this paragraph shall not exceed one-fourth of 1 per centum of the book value of the mean of the invested assets held at the beginning and end of the taxable year.

\*      \*      \*      \*      \*      \*      \*

In addition to the above provision, it is provided by section 203 (a) (6) that life insurance companies may, in computing their net income, deduct "taxes and other expenses paid during the taxable year exclusively upon or with respect to the real estate owned by the company, not including taxes assessed against local benefits of any kind tending to increase the value of the property assessed and not including any amount paid out for new buildings or for permanent improvements or betterments made to increase the value of any property." There is no provision in the statute for the deduction of taxes other than the taxes of the kind specified in section 203 (a) (6) above referred to.

It is clear from the statute that specific provision for the deduction of personal property taxes was not made as in the case of real estate taxes. The legislative history of the act throws no light on the omis-

sion nor is there anything to be found therein to indicate an intention on the part of Congress that personal property taxes were for the purpose of the acts to be considered as investment expenses and deductible as such. Paragraph (6) of subdivision (a) of section 203 specifically provides for the deduction of real estate taxes and this paragraph is preceded by paragraph (5) above quoted, providing for the deduction of investment expenses, under which classification the petitioner contends that personal property taxes come. Considering the juxtaposition of the two paragraphs in connection with the language of each, we think that the implication is that, had there been any intent on the part of Congress to allow personal property taxes as investment expenses as the petitioner claims, such taxes would have been specifically provided for as a deduction and that the failure to so provide indicates a purpose that they were not to be allowed. Respondent's determination that personal property taxes should be disallowed as deductions is sustained.

*Issues (j), (k), and (l).*—The inclusion by the Commissioner of certain amounts held to constitute taxable income on account of certain interest not actually received but credited on the books of the petitioner to the account of "Interest on collateral loans."

These issues, although involving substantially the same question, involve separate transactions and will therefore be discussed separately.

*Issue (j).*—The facts relating to this transaction were stipulated as follows:

On February 28, 1928, the petitioner made a certain collateral loan, No. 29, in the amount of $95,000.00 to R. C. Toombs, secured by bonds of the Village of Lansing, Illinois, of the par value of $120,000.00. A photostatic copy of the note, in the amount of $95,000.00 is hereto attached, marked "Exhibit 9" and made a part hereof.

Of the amount loaned, $82,046.70 was paid in cash to the said borrower, R. C. Toombs. The balance of the loan of $95,000.00, being the sum of $12,953.30, was applied by petitioner, through book entry, to the payment of interest due January 23, 1928, on loan No. 28, in the amount of $500,000.00 previously made to the said R. C. Toombs.

At December 31st of the taxable year 1928, there was interest due in the sum of $4,867.22 on collateral loan No. 29 hereinabove referred to. As of December 31, 1928, petitioner made entries on its books of accounts transferring the said amount of $95,000.00, heretofore standing as a collateral loan secured by the Village of Lansing, Illinois, improvement bonds of the par value of $120,000.00, to its bond account. As a part of the same transaction, it credited itself with interest in the amount of $4,867.22, which was the amount of interest due and unpaid on said collateral loan No. 29 at the time it made the entry last referred to.

Also, as a part of the same transaction, the petitioner increased the book entry in its bond account, hereinabove referred to, from $95,000.00 to $99,867.22, such increase representing the amount of interest due and unpaid on the collateral loan at the time the entry was made.

Prior to the book entry of December 31st last hereinabove referred to, the petitioner was notified by the State Bank & Trust Company of Downers' Grove, Illinois, that the said Village of Lansing, Illinois, bonds had been embezzled and stolen from the said bank, and the return of the said bonds demanded. A copy of such notification is hereto attached, marked "Exhibit 10" and made a part hereof.

Prior to December 31, 1928, and up to and including that date, petitioner, because of the nonpayment of the said note of $95,000.00 on demand made for payment thereof, had, pursuant to the terms of said note, appropriated to its own use the collateral securing said note, in the manner hereinbefore stated.

Subsequent to the aforesaid notice and demand for the return of the said bonds, action was instituted against the petitioner for the return of said bonds, and on March 19, 1930, the court, in the action of *State Bank & Trust Company* v. *Great Southern Life Insurance Company*, awarded to the said State Bank & Trust Company, Village of Lansing, Illinois, bonds, hereinbefore referred to, of the par value of $52,500.00, and this petitioner was permitted to retain such bonds of the par value of $67,500.00.

At all times prior to the said award by the court, of judgment in favor of the said State Bank & Trust Company, petitioner consistently refused to turn over such bonds to said Bank.

The interest items hereinabove referred to, being the sums of $12,953.30 and $4,867.22, were included in petitioner's gross income for the year 1928, and the respondent, in his audit, as evidenced by his sixty-day letter, made no change with respect thereto.

The note referred to as Exhibit 9 was payable on demand, with interest at the rate of 6 percent. It provided in part that "the undersigned hereby gives the legal holder, hereof his agent or assignee, authority to sell, or any part thereof, on the maturity of this Note, or at any time thereafter, or before, in the event of said securities depreciating in value, in the opinion of said legal holder hereof, his agent or assignee, at public or private sale, at his or their discretion, without advertising the same, or demanding payment, or giving any notice."

The petitioner, a life insurance company, is taxable under the provisions of section 203 of the Revenue Act of 1928 and therefore returns its income on the cash receipts and disbursements basis. It requires no citation of authorities to support the proposition that a taxpayer on the cash basis does not have to report interest merely accrued, but only reports interest received.

Under the foregoing stipulated facts it is clear that petitioner did not collect in cash the two items of interest in question, $12,953.30 on the $500,000 loan and $4,867.22 on the $95,000 loan. The Commissioner contends however that when petitioner loaned R. C. Toombs $95,000, February 28, 1928, and paid him only $82,046.70 in cash as the proceeds of the loan, applying $12,953.30 thereof to the payment of accrued interest on loan No. 28 owed petitioner by the same debtor, that was a collection of interest on loan No. 28 of

$12,953.30. We are of the opinion that petitioner "received" no income from the particular transaction referred to. In *Helvering* v. *Martin-Stubblefield, Inc.*, 71 Fed. (2d) 944, it was held, where a taxpayer on the cash receipts and disbursements basis deducted certain commissions from the principal of certain loans made in its business, that the commissions were not taxable income to the taxpayer until the loans were repaid, or until the notes evidencing the loans were sold. To the same effect see *Cosmopolitan Bond & Mortgage Co.*, 30 B. T. A. 717, and cases therein cited. We think the same rule applies to the interest of $12,953.30 which petitioner deducted from the $95,000 loan at the time the loan was made. Cf. *Francis R. Hart*, 21 B. T. A. 1001; affd., 54 Fed. (2d) 846. However if petitioner collected the two items of interest in question by the purchase at foreclosure sale of property 'on which it had a lien, securing title thereby and paying for the property a purchase price equal to its debt plus accrued interest, it is taxable on the interest thus collected. *National Life Insurance Co.* v. *United States*, 4 Fed. Supp. 1000; certiorari denied, 291 U. S. 683; *Reserve Loan Life Insurance Co.*, 18 B. T. A. 359; *Missouri State Life Insurance Co.*, 29 B. T. A. 401; *American Central Life Insurance Co.*, 30 B. T. A. 1182.

Petitioner contends however that prior to the time of its attempted foreclosure of its lien on bonds of the village of Lansing, Illinois, the petitioner had been notified that the said collateral had been embezzled and stolen and that the said R. C. Toombs did not therefore have rightful possession and ownership of the collateral, or any right to make a pledge of such collateral; and petitioner contends that it succeeded to no greater interest in and to such collateral than that which R. C. Toombs had; and that in 1930 the United States District Court for the Southern District of Texas awarded to the State Bank & Trust Co. $52,500 of the par value of said bonds and permitted petitioner to retain $67,500 of their par value; and that the amount which petitioner was permitted to retain was less than the principal of its note secured by such bonds and therefore there was no collection of interest in 1928 when the foreclosure occurred.

We think petitioner must be sustained in its contention. The purchaser at a foreclosure sale takes the title of the mortgagor as it stood at the date of the execution of the mortgage. *Ostenberg* v. *Union Trust Co.*, 93 U. S. 424. Cf. also *Brant* v. *Virginia Coal & Ice Co.*, 93 U. S. 326. In the instant case the mortgagor was R. C. Toombs, and it appears from the judgment of the United States District Court to which we have referred that at the time he mortgaged these bonds to petitioner he had title to only $67,500 par value of them and title to $52,500 of them was in State Bank & Trust Co.

Under these circumstances petitioner never did get any title to $52,500 of these bonds and its attempted purchase at foreclosure sale was to that extent a nullity.

We do not consider our holding in this respect contrary to *North American Oil Consolidated* v. *Burnet*, 286 U. S. 417. In that case the Supreme Court, in holding certain income to be income when received rather than when certain litigation concerning such income was settled in a later year, said:

If a taxpayer receives earnings under a claim of right and without restriction as to its disposition, he has received income which he is required to return, even though it may still be claimed that he is not entitled to retain the money, and even though he may still be adjudged liable to restore its equivalent. See *Board* v. *Commissioner of Internal Revenue*, 51 F. (2d) 73, 75, 76. Compare *United States* v. *S. S. White Dental Manufacturing Co.*, 274 U. S. 398, 403. If in 1922 the Government had prevailed, and the company had been obliged to refund the profits received in 1917, it would have been entitled to a deduction from the profits of 1922, not from those of any earlier year. Compare *Lucas* v. *American Code Co., supra.*

In the instant case petitioner did not receive cash payments " under a claim of right and without restrictions as to its disposition." What petitioner did was to make an attempted foreclosure of its lien on certain bonds which it held as collateral. It was notified prior to the foreclosure that the bonds were embezzled and it turned out that this allegation was true as to $52,500 of the bonds. Petitioner therefore by its attempted foreclosure realized less than the principal of its note and there was no collection of the two items of interest in question. On this issue we sustain petitioner.

*Issue (k)*.—The facts relating to this transaction were stipulated as follows:

Prior to the taxable year 1928, the petitioner made a collateral loan, No. 28, in the amount of $500,000.00 to R. C. Toombs, secured by certain stock issued by Toombs & Dailey Company, an Illinois corporation. A copy of the note is hereto attached, marked " Exhibit 11 " and made a part hereof. On January 23, 1928, a renewal note, copy of which is hereto attached, marked " Exhibit 12 " and made a part hereof, was accepted by the petitioner in lieu of the former note hereinabove referred to, for like amount, and 9,000 shares of the capital stock of the International Life Insurance Company of the par value of $25.00 per share was accepted as collateral security therefor in lieu and substitution of the security theretofore posted, at which time the original collateral was returned to the borrower, R. C. Toombs.

Certificates Nos. D–11009, D–11010 and D–11011 for nine thousand shares of International Life Stock, accepted by the petitioner as collateral for the renewal note on January 23, 1928, were a fraudulent and excessive issue of such said stock; that thereafter the borrower, R. C. Toombs, during the month of June, 1928, without revealing the real reason therefor, substituted, as collateral security for the said note, three certificates numbered D–11239, D–11240, and D–11241, representing genuine and valid stock of the said company, which stock, however, at the time the same was deposited by the said

Toombs with the petitioner as collateral, was owned by the International Company of Saint Louis.

That on or about August 1, 1928, there came to the knowledge and notice of the said Great Southern Life Insurance Company sufficient facts to put said company upon inquiry as to the want of ownership of said stock by said Toombs and as to the validity of the pledge thereof to the Great Southern Life Insurance Company to secure the indebtedness represented by the said Toombs note; that such facts became known to the Great Southern Life Insurance Company prior to any attempted foreclosure by it of said stock under the power of sale given by said Toombs.

The interest entry of $12,953.30, hereinbefore referred to under section (j), was made by the petitioner in connection with this renewal transaction.

On July 23, 1928, there became due upon said loan, interest in the sum of $13,833.33.

On December 31, 1928, there was due to the petitioner, according to petitioner's books (in addition to the delinquent interest of July 23, 1928, in the amount of $13,833.33), interest in the amount of $13,166.67 plus interest on delinquent interest due July 23, 1928, in the amount of $364.26.

On August 9, 1928, a receiver was appointed by the District Court of the United States for the Eastern Division of the Eastern Judicial District of Missouri, for the said International Life Insurance Company.

As of December 31, 1928, the petitioner made an entry on its books, cancelling the loan and transferring to the account known as " Stocks Owned " at a book value of $500,000.00, the collateral which had theretofore secured the loan. At the same time this entry was made, the petitioner credited the amount of interest purported to be due, and unpaid on this collateral loan, $27,364.26, as interest received, and increased the book value of the stock to $527,364.26.

On or about July 1, 1930, the District Court of the United States for the Eastern Division of the Eastern Judicial District of Missouri determined that the petitioner had an ownership interest in such said stock only to the extent of $500,000.00 with interest thereon at the rate of six per cent per annum from January 23, 1928, to August 15, 1928, and that any equity or value which thereafter might be realized over and above the mentioned sum of $500,000.00 and interest was the property of and should accrue to the benefit of the International Company of St. Louis.

The said interest, in the sum of $27,364.26, was included in petitioner's gross income of the year 1928, and the respondent in his audit, as evidenced by his sixty-day letter, made no change with respect thereto.

Petitioner in support of its contentions relative to this transaction relies upon certain facts stipulated under transaction (*l*). We will, therefore, state the facts relative to transaction (*l*) and then rule upon both transactions (*k*) and (*l*).

*Issue* (*l*).—The facts relating to this transaction were stipulated as follows:

On July 20, 1925, the petitioner made a certain collateral loan, No. 7, in the amount of $500,000.00, to the International Company of St. Louis, due on or before five years after said date, July 20, 1925, secured by 7,700 shares of the capital stock of the International Life Insurance Company of St. Louis, Missouri, of the par value of $25.00 per share.

The said collateral loan, No. 7, in the amount of $500,000.00, was evidenced by ten separate notes of $50,000.00 each, of identical form, as per photostatic

copy hereto attached, marked "Exhibit 13" and made a part hereof—each of such notes being secured by 770 shares of the capital stock of the International Life Insurance Company of St. Louis, Missouri, of the par value of $25.00 per share.

On August 9, 1928, as set forth under section (k) hereinabove, a receiver was appointed for the said International Life Insurance Company, and on the same date a receiver was appointed for the said borrower, the International Company of St. Louis, by the District Court of the United States for the Eastern Division of the Eastern Judicial District of Missouri.

On August 24, 1928, by order of the District Court for the Eastern Judicial District of Missouri, all creditors of the International Company of St. Louis and all other persons whatsoever were enjoined from foreclosing or taking any steps to foreclose any mortgages or pledges held by them to secure indebtedness of the said International Company or from filing suit to enforce any indebtedness against said Company.

Thereafter, on July 1, 1930, pursuant to order of the District Court of the United States for the Eastern Judicial District of Missouri, the petitioner surrendered to the receivers of the International Company of St. Louis the 7,700 shares of stock of the International Life Insurance Company referred to in the present subdivision, and the 9,000 shares of stock of the same company referred to hereinabove under paragraph (k), or a total of 16,700 shares, together with the note of R. C. Toombs in the amount of $500,000.00 and the note of the International Company of St. Louis in the amount of $500,000.00, together with petitioner's claim for due and delinquent interest and attorney's fees incurred, in exchange for twenty-three certificates of indebtedness of the International Company of St. Louis and of Massey Wilson and Joseph B. Thompson, Receivers of the International Company of St. Louis, each in the par value of $50,000.00, totaling $1,150,000.00, secured by a posted collateral of 22,485.0503 shares of the capital stock of the International Life Insurance Company of St. Louis as set forth in the certificate of indebtedness. A copy of said certificate of indebtedness is hereto attached, marked "Exhibit 14" and made a part hereof.

The above sum of $1,150,000.00 was computed as follows:

| | |
|---|---:|
| International Life Insurance Co. stock, Loan No. 28 | $527,364.26 |
| Interest thereon | 45,802.38 |
| International Company, Loan No. 7 | 500,000.00 |
| Interest thereon | 58,416.63 |
| Attorney's fees in connection therewith | 18,416.73 |
| Total | $1,150,000.00 |

In the taxable year 1930, at the time of the exchange of the notes and collateral hereinabove referred to, for the certificates of indebtedness in the total amount of $1,150,000.00 as above set forth, the petitioner entered upon its books as interest received in connection therewith the sum of $104,219.01, and thereafter carried the $1,150,000.00 on its books as a collateral loan. No payments upon the said collateral loan as represented by the said certificates of indebtedness were made to this petitioner by the receivers of the International Company of St. Louis in the taxable year 1930.

The said interest, in the sum of $104,219.01, was included in petitioner's gross income for the year 1930, and the respondent in his audit, as evidenced by his sixty-day letter, made no change with respect thereto.

Regarding transaction (k) petitioner strongly contends that the court's order dated August 24, 1928, "conclusively prevented this

petitioner from foreclosing and taking over the said stock and made such attempted foreclosure a nullity and that the status of such stock continued throughout said year as collateral to the aforementioned loan." We find ourselves unable to agree with petitioner as to this contention. We do not believe the court's order of August 24, 1928, had such an effect. Although petitioner was a creditor of the International Co. of St. Louis, it was not, however, attempting to foreclose on any mortgage or pledge held by it to secure the indebtedness to it of that company. The pledge upon which petitioner foreclosed in 1928 was the pledge of Toombs of 9,000 shares of stock of the International Life Insurance Co. True, the parties have stipulated that this stock "was owned by the International Company, of St. Louis." But petitioner did not concede such ownership in 1928. In fact, it acted in the very opposite manner by foreclosing and appropriating to its own use the said 9,000 shares in accordance with the terms of the note. Petitioner does not contend, nor has it shown, that the said 9,000 shares were worth less than the amount of $527,364.26, the amount at which petitioner recorded the said foreclosure on its books of account. But petitioner further argues that the action of the court in 1930, whereby petitioner surrendered both (1) Toombs' note and (2) the 9,000 shares of International Life Insurance Co. stock for certificates of indebtedness of the International Co. of St. Louis of a par value of $527,364.26, clearly shows that the court in 1930 did not recognize the foreclosure which petitioner attempted in 1928. We also fail to agree with this contention. The parties have stipulated that:

Thereafter, on July 1, 1930, pursuant to order of the District Court of the United States for the Eastern Judicial District of Missouri, the petitioner surrendered to the receivers of the International Company of St. Louis the 7,700 shares of stock of the International Life Insurance Company referred to in the present subdivision, and the 9,000 shares of stock of the same company referred to hereinabove under paragraph (k), or a total of 16,700 shares, together with the note of R. C. Toombs in the amount of $500,000.00 and the note of the International Company of St. Louis in the amount of $500,000.00, together with petitioner's claim for due and delinquent interest and attorney's fees incurred, in exchange for twenty-three certificates of indebtedness of the International Company of St. Louis and of Massey Wilson and Joseph B. Thompson, Receivers of the International Company of St. Louis, each in the par value of $50,000.00, totaling $1,150,000, secured by a posted collateral of 22,485.0503 shares of the capital stock of the International Life Insurance Company of St. Louis as set forth in the certificate of indebtedness.

This would seem to indicate that the court did recognize the foreclosure in 1928 to the extent of principal and interest in the total amount of $527,364.26. We do not think the fact that petitioner exchanged the said 9,000 shares in 1930 for certain certificates of indebtedness of the International Co. of St. Louis has any material

bearing on the taxability of the transaction in 1928 and the $27,364.26 interest involved in issue (k). At the close of 1928 Toombs was in default on his note to the extent of $527,364.26 in principal and interest. In accordance with the terms of the note petitioner had a right to foreclose and appropriate the collateral to its own use, which it did. The court seems to have subsequently recognized the validity of this foreclosure.

We, therefore, sustain the respondent in his determination that petitioner correctly reported the item of $27,364.26 as taxable income in 1928. *National Life Insurance Co.* v. *United States, supra; North American Oil Consolidated* v. *Burnet, supra.*

Regarding transaction (*l*), the question for our determination is whether petitioner correctly reported as income the said sum of $104,219.01, which amount is the sum of the two smaller amounts of $45,802.38 and $58,416.63, set out in our findings under the heading of transaction (*l*). We think, for reasons immediately following, that petitioner is taxable on the $45,802.38 as income in 1930, but that it was in error in reporting as income in that year the amount of $58,416.63.

During 1930 petitioner acquired from the receivers of the International Co. of St. Louis certain certificates of indebtedness of the total amount of $1,150,000, which were received to cover certain items enumerated in the stipulation quoted above under issue (*l*).

We regard this acquisition as partly in the nature of an exchange of one class of property for another and as partly in the nature of the renewal of a loan. The District Court had decided that petitioner had an ownership interest in the 9,000 shares of International Life Insurance Co. stock to the extent of $500,000 with interest, or a total ownership interest of $527,364.26, plus further accrued interest on the R. C. Toombs' transaction of $45,802.38. This grew out of the R. C. Toombs' loan No. 28 for $500,000 and petitioner's foreclosure thereon. We think petitioner exchanged that ownership interest for certificates of indebtedness of the face value of $573,166.64 ($527,364.26 plus $45,802.38), and that it realized a further collection of interest of $45,802.38 on the exchange. Revenue Act of 1928, sec. 111 (a), (c), and (d), sec. 112 (a), and sec. 113 (a). Petitioner has not shown that these certificates secured by collateral were not worth their face value. Of course if petitioner had received for its loan and accrued interest against R. C. Toombs, amounting in all to $573,166.64, receiver's certificates of R. C. Toombs as an individual, it would have been only evidence of indebtedness of the same debtor and there would have been nothing which could be termed a collection of interest on the Toombs transaction. But what happened, as shown by the

stipulation, was that petitioner received, in lieu of the note and collateral which it held against Toombs, receiver's certificates of an entirely different debtor, to wit, the International Co., and these receiver's certificates were secured by collateral and, as above stated, there is nothing in the stipulation to show they were not worth their face value.

Paul and Mertens, in their work " Law of Federal Income Taxation ", have chapter 10 of volume I, devoted to the subject of " Income and Deductions in the Equivalent of Cash." At paragraph 10.16 of this chapter, it is said : " Bonds, notes, and contracts for the payment of money and other property are the equivalent of cash, if received on an income-producing transaction, to the extent of their fair market value, but they are not the equivalent of cash if they are affected by a genuine contingency as to time or certainty of performance or amount collectible. Bonds, notes, or contracts will be held worth par, or what the Commissioner determines, if the taxpayer does not produce evidence to overcome the presumption that the Commissioner's findings were incorrect."

As we have already stated, we regard the exchange of R. C. Toombs' note of $500,000 plus accrued interest secured by collateral for receiver's certificates of the International Co., also secured by collateral, as an income-producing transaction. There seems to have been no genuine contingency as to time or certainty of performance or amount collectible in these receiver's certificates. The petitioner treated them in its income tax return as worth face value and returned the item of interest in question as collected in 1930. For reasons above stated, we find no reason to disturb petitioner's treatment of the item. As to this item of $45,802.38, the Commissioner is sustained.

The acquisition of certificates of indebtedness to the extent of $558,-416.63 to take the place of the $500,000 loan and accrued interest of the International Co. amounted to no more, in our opinion, than the renewal of the International Co. loan No. 7, together with the accrued interest thereon. The petitioner, being on the cash basis, would receive no interest income until the renewal loan was either paid or some other disposition was made of it. *Helvering* v. *Martin-Stubblefield, Inc., supra.* We are, therefore, of the opinion that both petitioner and respondent were in error in including in petitioner's taxable income for the year 1930, as interest, the amount of $58,416.63.

*Issues (n), (o-1), and (o-2).*—The inclusion by the Commissioner, as taxable income, of certain amounts of interest purchased by petitioner in connection with the purchase by it of certain assets upon which there was accrued interest due at the time of such purchase.

On March 5, 1929, February 11, 1930, and March 12, 1930, petitioner reinsured the business of three other insurance companies. In each

of the contracts entered into on these respective dates, it was provided that petitioner "assumes, reinsures and hereby agrees to pay all of the outstanding policy obligations" of the particular company in question. In addition to the contracts of reinsurance petitioner entered into a contract of purchase of the remainder of the assets of each of the three other insurance companies. The contract of purchase which petitioner made with the Louisiana State Life Insurance Co. of Shreveport, Louisiana, is typical of the contracts made with the other two companies and reads as follows:

STATE OF LOUISIANA
PARISH OF CADDO . . .

In the reinsurance contract between the Great Southern Life Insurance Company of Houston, Texas, and the Louisiana State Life Insurance Company of Shreveport, Louisiana, hereinafter respectively called the GREAT SOUTHERN and LOUISIANA STATE, which said reinsurance contract is hereby referred to and made a part hereof, it is provided that the LOUISIANA STATE shall assign to the GREAT SOUTHERN properties and securities equal in value to the reserve on the policies being reinsured, the terms of said reinsurance contract in this respect being set out therein and by reference incorporated herein and made a part of this contemporaneous agreement.

After taking a sufficient amount of said properties and securities to make up said reserves, as aforesaid, the GREAT SOUTHERN agrees to buy, on the terms hereinafter named, the balance of the mortgages, securities and other admitted assets owned by the LOUISIANA STATE, in which its funds have been invested in conformity with the laws of the States of Texas and Louisiana. These mortgages, securities and other admitted assets are to be taken subject to the approval of the Finance Committee of the GREAT SOUTHERN. The amount that the GREAT SOUTHERN is to pay for these mortgages, securities and other admitted assets, is the par value thereof, with accrued interest up to the date that they are respectively taken over.

It is also understood and agreed that for the consideration aforesaid and other good and valuable considerations, that the Louisiana State is to assign to the GREAT SOUTHERN all of its "non-admitted assets."

The writing and signing of this document by the GREAT SOUTHERN and the LOUISIANA STATE is to be binding and go into effect when the said reinsurance contract becomes effective, and same is to constitute a supplement or addendum to the said reinsurance contract.

IN TESTIMONY WHEREOF, the parties hereto have caused these presents to be executed in duplicate on this, the 5th day of March, 1929, each to be taken and treated as an original.

[Signatures.]

In consideration of such assumption and agreement to purchase on the part of petitioner, the reinsured companies assigned to petitioner certain of their assets, which consisted in part of accrued interest in the respective amounts of $39,256.18, $7,318.53, and $111,956.99. Of the amounts of accrued interest acquired from the reinsured companies, petitioner collected and reported as taxable income for the year 1929 the amount of $33,163.85, and for the year 1930 the respective amounts of $4,665.57 and $85,807.94.

Petitioner contends that the amounts of $33,163.85, $4,665.57 and $85,807.94 represented a return of capital when collected by it, and should not, therefore, be included in its taxable net income. This is the same contention that was made in the case of *Missouri State Life Insurance Co.*, 29 B. T. A. 401 (issue No. 8, p. 410), under somewhat similar circumstances to those present in the instant case and in which we sustained the Commissioner.

Our decision on that point was reversed in *Missouri State Life Insurance Co.* v. *Commissioner*, 78 Fed. (2d) 778. The court, after briefly stating the facts on this point, said:

* * * We think that the accrued interest on the loans transferred to and purchased by the taxpayer did not constitute income to it. True, it took over the business of the International and agreed thenceforth to conduct it, but not as agent of the International. The consideration for the taxpayer's promise to reinsure, to assume all liabilities, and to account for profits, if any, was the transfer of the assets, including the accrued interest on loans. Had it paid cash for these assets, the situation would have been no different.

We think the facts in the instant case are not distinguishable in substance from those which were present in the *Missouri State Life Insurance Co.* case. True it is that in that case the company which was reinsured was insolvent and the assets taken over by the Missouri State Life Insurance Co. were of less value than the liabilities assumed, whereas in the instant case the companies reinsured were not insolvent and the value of the assets was greater than the amount of liabilities assumed and the petitioner contracted to pay and did pay the par value plus accrued interest in cash for all excess securities purchased. As pointed out by the court in its opinion above quoted, there is no difference in treatment of a purchase of assets in consideration of assumption of liabilities and those purchased for cash.

Under these circumstances we do not think the items of interest in question, $33,163.85 for 1929 and $4,665.57 and $85,807.94 for 1930, were income to petitioner for the respective years. The collection of this interest, under the circumstances stated, represented a return of capital. *Missouri State Life Insurance Co.* v. *Commissioner, supra.* Cf. *L. A. Thompson Scenic Railway Co.*, 9 B. T. A. 1203; *Erskine Hewitt*, 30 B. T. A. 962.

In both of the last named cases we held that where the amount of the interest collected was less than the cost of the accrued interest at the time of purchase, the amount received represented a return of capital and there was no taxable income.

The case of *Pontiac Commercial & Savings Bank*, 11 B. T. A. 118; affd., 41 Fed. (2d) 602, cited by us in our decision in *Missouri State Life Insurance Co., supra*, at page 412, is distinguishable from

the instant case. In the *Pontiac Commercial & Savings Bank* case there was a consolidation of two banks which brought their combined assets into the consolidated corporation. There was no purchase of assets by one banking institution from another. The accrued interest on the securities taken over by the consolidated bank from the two consolidating banks was not taken into capital account in the transaction. As pointed out by the court in affirming our decision in that case:

> This interest having been assigned to petitioner and yet having been omitted from the capital account, when collected by petitioner necessarily became income to petitioner just as it would have been to the Pontiac Savings Bank if collected before the transfer of securities.

We have no such situation in the instant case. There was no consolidation of petitioner with the other three life insurance companies which it reinsured. It took over enough securities plus accrued interest to equal the liabilities which it was assuming in the reinsurance agreements and then purchased the balance of the securities at par plus accrued interest. On this issue we decide in favor of petitioner.

*Issues (p) and (q).*—The failure of the Commissioner in computing petitioner's reserve deduction, to take into consideration the reserves held at the beginning of certain calendar years by other life insurance companies taken over by and reinsured by the petitioner during such same taxable year.

Petitioner, on March 5, 1929, reinsured and acquired by purchase, all the business of the Louisiana State Life Insurance Co., which business was then and thereafter merged and mingled with the business of petitioner. The reserves of the Louisiana State Life Insurance Co. required to be maintained by law on January 1, 1929, were in the sum of $1,656,681.96. The reserves required to be maintained by law by petitioner on January 1, 1929, were in the sum of $20,898,-224; and on December 31, 1929, including the business of the Louisiana State Life Insurance Co., were in the sum of $24,860,683.

On February 11, 1930, petitioner reinsured and acquired all of the business of the American Southern Life Insurance Co.

On March 12, 1930, petitioner reinsured and acquired all of the business of the Southern Union Life Insurance Co.

At the beginning of the taxable year 1930 the reserve fund of the American Southern Life Insurance Co. required to be maintained by law was the sum of $763,364.31, and the reserve fund required by law as of the same date for the Southern Union Life Insurance Co. was in the sum of $6,216,153. The reserve fund required to be maintained by law by petitioner on January 1, 1930, was the sum of $24,860,683. At the end of the taxable year 1930 the reserves held by petitioner and required to be maintained by law, including the

business of the American Southern Life Insurance Co. and the Southern Union Life Insurance Co., were in the sum of $33,950,422.

The applicable statute is the Revenue Act of 1928, the material part of which is as follows:

SEC. 203. NET INCOME OF LIFE INSURANCE COMPANIES.

(a) *General Rule.*—In the case of a life insurance company the term " net income " means the gross income less—

(1) TAX-FREE INTEREST.—The amount of interest received during the taxable year which under section 22 (b) is exempt from taxation under this title;

(2) RESERVE FUNDS.—An amount equal to the excess, if any, over the deduction specified in paragraph (1) of this subsection, of 4 per centum of the mean of the reserve funds required by law and held at the beginning and end of the taxable year * * *.

Both parties agree that petitioner is entitled to deduct the entire " 4 per centum of the mean of the reserve funds required by law and held at the beginning and end of the taxable year " without any abatement on account of the deduction specified in paragraph (1) of section 203 (a). See *National Life Insurance Co.* v. *United States*, 277 U. S. 508; article 971, Regulations 74; *Midland National Life Insurance Co.*, 14 B. T. A. 200. The disagreement between the parties arises over the determination of the amount of the reserves to be considered at the " beginning " of the respective taxable year in determining the 4 percent of the mean. The respondent has considered only petitioner's own reserves of $20,898,224 at the beginning of 1929 and $24,860,683 at the beginning of 1930. Petitioner contends that for the year 1929 the respondent should also have considered the reserve of $1,656,681.96, effective from March 5, 1929; and for the year 1930 the reserves of $763,364.31 and $6,216,153, effective from February 11, 1930, and March 12, 1930, of the companies purchased by petitioner, respectively.

There is no authority in the statute for including in petitioner's reserve funds held at the beginning of the taxable year any part of the reserve funds of another company acquired by petitioner during the year. We think that Congress, by allowing as a deduction 4 percent of the " mean " of the taxpayer's reserve funds required by law and held at the beginning and end of the taxable year, intended thus to average by *one* computation all changes occurring in the reserve funds during the year, without regard as to how or when such changes occurred.

Petitioner, however, in arriving at the one general average, would include in the reserve funds held at the " beginning " of the year the reserve funds of any company acquired during the year, averaged during the period held by petitioner, and in support of this contention invokes the application of section 45 of the Revenue Act of 1928, which provides:

In any case of two or more trades or businesses (whether or not incorporated, whether or not organized in the United States, and whether or not affiliated) owned or controlled directly or indirectly by the same interests, the Commissioner is authorized to distribute, apportion, or allocate gross income or deductions between or among such trades or businesses, if he determines that such distribution, apportionment, or allocation is necessary in order to prevent evasion of taxes or clearly to reflect the income of any of such trades or businesses.

In our opinion there is no ground for the application of section 45, *supra*, to the facts of this case. Section 45 is applicable only in the case of " two or more trades or businesses ", whereas in the instant proceeding there is involved but one trade or business, namely, that of petitioner. The parties have stipulated that the businesses acquired by petitioner were immediately " merged and mingled with the business of petitioner." Furthermore, section 45 is one of the " General Provisions " of Subtitle B, which by section 4 of the act is made " subject to the exceptions and additional provisions " of Supplement G, especially applicable to insurance companies, which supplement includes section 203 (a) (2), *supra*. We think the latter section plainly provides for but one average, namely, one half of the total reserve funds "held at the beginning and end" of the taxable year. The respondent's determination on this issue is approved.

*Issue* (r–2).—The failure of the Commissioner to allow as a deduction from gross income, certain interest paid to policyholders pursuant to provisions of a certain type of survivorship contract forming part of certain of petitioner's policies of insurance.

On March 12, 1930, as hereinabove set forth, petitioner reinsured and merged the business of the Southern Union Life Insurance Co., assuming thereby the obligations and indebtedness of certain survivorship contracts or policies of insurance, a specimen of which is as follows:

SPECIAL SURVIVORSHIP FUND CONTRACT AND AGREEMENT

CLASS A

The ———————— Company hereby agrees to set aside into a special Survivorship Fund Twenty Per Cent (20%) of each renewal premium paid to the Company by the holder of this policy, together with Twenty Per Cent (20%) of all the renewal premiums paid by the holders of the Special Survivorship Fund policies issued in the same calendar year, and to invest said Survivorship Fund in securities prescribed by the laws of the State of Texas, and to maintain and improve said Fund by Three and One-Half (3½) per cent interest, compounded annually.

The Whole of this Special Survivorship Fund and accumulated interest, as above provided, will on the ——— day of ——— 19—, be distributed in cash among the holders of Special Survivorship Fund policies issued by the Company in the calendar year ———, then in full force and effect under their original terms, in proportion to the premium paid by each respective holder of such Special Survivorship Fund Policy.

Attached to and made a part of Policy No. ——— issued by ——————— ——— Company on the ——— day of ———, 19—, on the life of ——————— ———————.

The survivorship contract or policy provides for the setting aside in a special fund of a certain part of the annual premium. Pursuant to the provisions of such contract or policy the fund known as the "Survivorship Fund" is enlarged by so-called interest and is distributed upon the expiration of 20 years to the surviving persistent members of that group of policyholders to whom such policies were issued during any calendar year. In the taxable year 1930 a number of such policies matured, and in connection with the distribution of the survivorship fund the petitioner disbursed the sum of $16,096.31 on such obligation.

Of the said total amount of $16,096.31 so disbursed in the year 1930, the sum of $8,434.07 represented deposits of principal in the survivorship fund and the sum of $7,662.24 represented interest.

Petitioner contends that it is entitled to deduct the interest in the amount of $7,662.24 from its gross income, under section 203 of the Revenue Act of 1928, the material part of which is as follows:

SEC. 203. NET INCOME OF LIFE INSURANCE COMPANIES.

(a) *General Rule.*—In the case of a life insurance company the term "net income" means the gross income less—

\*     \*     \*     \*     \*     \*     \*

(8) INTEREST.—All interest paid or accrued within the taxable year on its indebtedness, except \* \* \*.

Petitioner in support of its contention cites the case of *Lafayette Life Insurance Co.* v. *Commissioner*, 67 Fed. (2d) 209. The respondent relies upon our decisions in *Reserve Loan Life Insurance Co.*, 18 B. T. A. 359, *Lafayette Life Insurance Co.*, 26 B. T. A. 946; and *Missouri State Life Insurance Co.*, 29 B. T. A. 401, 404; affirmed on this point in *Missouri State Life Insurance Co.* v. *Commissioner*, *supra.* In the last mentioned case we said:

Our decision in the *Lafayette Life Ins. Co.* case, *supra*, was reversed on appeal, *supra*, upon this issue, also. However, having consistently followed the rule we there adopted, in a number of cases, decisions in which were by memorandum opinion, and remaining convinced of its correctness, we adhere thereto and sustain respondent upon this issue.

See also *Penn Mutual Life Ins. Co.*, 32 B. T. A. 839, issue one of the opinion, dealing with a situation essentially the same as we have here. We therefore sustain the respondent's determination upon this issue.

Reviewed by the Board.

*Decision will be entered under Rule 50.*

Leech, dissenting: I disagree with the conclusion reached by the majority upon issue (j), on the authority of the case of *John C. Hermann,* 27 B. T. A. 409.

McMahon agrees with this dissent.

———

McMahon, dissenting: I respectfully dissent from the allowance of the deduction of $23,973.80 as interest from petitioner's gross income for 1930 which is involved in issue (b) (1). None of this amount is interest. It all results from " Participation in Profits " as provided for in the policy contract as quoted in part by the majority. It is within such express classification as set forth in such contract. The coupons attached to the policy contract represent nothing but " dividends " under such " Participation " within the express terms of such contract. Under such terms upon surrender of these *dividend* coupons " Four Dividend Options " are open to the holder of the policy contract. All of them come within the express designation of such " Participation in Profits " and they are as follows:

FOUR DIVIDEND OPTIONS

I. In Cash.
II. Applied to the payment of any premium or premiums.
III. Applied to the purchase of paid-up additions to the policy.
IV. Left to accumulate to the credit of the policy, with interest at not less than three and one-half per centum per annum, payable at maturity of the policy but withdrawable at any time by the Insured.

Under the first three of these " Four Dividend Options " the holder gets a cash *dividend* or its equivalent and nothing else. The term " interest " is not used in them. Option IV is but a method afforded the holder of the policy contract for further " Participation in Profits " of the petitioner upon surrender of the attached *dividend* coupon whereupon *dividends* " may be received " by this method, among others. Such further " Participation " is thus likewise expressly contracted for. As to " Dividends " represented by *dividend* coupons " left to accumulate ", the rate of " per centum per annum " of accumulation is not disclosed by the findings. The words " not less than " as used in IV of the " Four Dividend Options " are significant. They indicate that the rate may be more " than three and one-half per cent per annum." Obviously, the rate may be more only because the earnings of the petitioner may justify a larger " Participation " in such earnings. The rate actually received, whether higher or not, is but the measure of the " Participation in Profits ", " dividends " or distribution of the earnings of the petitioner. That the

rate may be higher in the light of all the pertinent language of the policy demonstrates that the word "interest" as used here is not used in its ordinary sense or in the sense in which it is used in the statute which permits life insurance companies to deduct interest. This term as used in the statute and ordinarily used is limited to a fixed rate and does not embrace a "PARTICIPATION IN PROFITS", "dividends" or distribution of earnings at a *variable* rate as provided for in the policy contract. The use of the word "accumulate" in option IV of the "FOUR DIVIDEND OPTIONS" is wholly in keeping with the view herein set forth. Too, the "dividend" represented by the coupon "attached thereto" is, by the express terms of the policy contract, "the *minimum* dividend" [emphasis supplied]. This is all in keeping with the view that in the light of all of the quoted language of the policy contract we have here in fact only "PARTICIPATION IN PROFITS", "dividends" and distribution of earnings and not interest. It is true that option IV contains the words "with interest", but other more extensive language of the policy contract, the nature of petitioner's business, and all the other pertinent facts and circumstances disclosed, demonstrate that these words are not therein used in their ordinary sense. Even this option IV in which the word "interest" is thus used is expressly embraced in the "FOUR DIVIDEND OPTIONS" which are expressly classified as "PARTICIPATION IN PROFITS" in the policy contract; and the "three and one-half per centum per annum" is therein designated primarily as a minimum rate of "Dividend" and of "PARTICIPATION IN PROFITS." Calling a thing interest does not make it such when it is in truth not interest. *Johnson Locke Mercantile Co.* v. *Burnet*, 51 Fed. (2d) 434, affirming *Johnson Locke Mercantile Co.*, 15 B. T. A. 1314. See the dissenting opinion in *Penn Mutual Life Insurance Co.*, 32 B. T. A. 839, at 852–860, for full discussion and authorities cited therein. That we had a mutual life insurance company and a policy contract containing different phraseology before us there has not been overlooked.

If there is anything in article 75 of Regulations 74, Revenue Act of 1928, or in I. T. 2717, C. B. XII–2–94, cited and quoted from by the majority, which is contrary to or in conflict with the conclusion reached in this dissenting opinion or in the dissenting opinion in *Penn Mutual Life Insurance Co.*, *supra*, just cited above, such article 75 and I. T. 2717 are to that extent in error and should not be adhered to. As stated by the United States Supreme Court in *Helvering* v. *Powers*, 293 U. S. 214:

But the Treasury Department could not by its regulations either limit the provisions of the statute or define the boundaries of their constitutional application.

Concurring or acquiescing in that which is without requisite statutory authority can not obviate the necessity of statutory amendment.

Even if the respondent were to acquiesce in the allowance of the deduction of the $23,973.80 in question here, such acquiescence would not cure the lack of statutory authority.

The result, at which this dissenting opinion is directed, reached by the majority in these proceedings and the result, at which the cited dissenting opinion is directed, reached by them in the other proceeding, is the allowance of substantial deductions here and there and the establishment of precedents for the allowance of very large amounts of other deductions, in the aggregate, with resulting losses to the Federal Government of large amounts of taxes, in the aggregate, all without any of the requisite statutory authority or any cited valid precedent therefor.

The holding of the Board in *Reserve Loan Life Insurance Co.*, 18 B. T. A. 359, discussed by the majority, disallowing deductions as interest because the amounts involved were, in fact, not interest, is correct; and to this extent supports the conclusion set forth in this dissenting opinion.

*Helvering* v. *Inter-Mountain Life Insurance Co.*, 294 U. S. 686, and *Massachusetts Mutual Life Insurance Co.* v. *United States*, 288 U. S. 269, cited by the majority, are distinguishable upon this aspect of the instant proceedings.